EDITH H. JONES, Circuit Judge:
Appellants Astrolabe Shipping Ltd., Blue Emerald Shipping Ltd., and Kassos Maritime Enterprises Ltd., individually and as claimants of the MW MOUNT YMITOS and the MOUNT YMITOS, in rem (hereinafter *450 collectively referred to as “appellants” or “the MOUNT YMITOS”) appeal the decision of the district court, after a trial to the bench, which apportioned liability against them for a collision in the Southwest Pass south of New Orleans. We reverse the district court’s finding that there existed a custom of passing starboard to starboard in the waterways in which the collision occurred. Although as to the court's other findings and conclusions we find no reversible error, we must remand to allow the district court the opportunity to reapportion liability in light of this modification.
FACTUAL BACKGROUND
As appellees Hal Antillen N.V. and Holland America Line Westours, Inc. (hereinafter collectively referred to as “appellees” or “the NOORDAM”) state, this case turns on a turn. On the night of November 6, 1993, at approximately 8:40 p.m., the NOORDAM, a 33,933 ton passenger liner, and the MOUNT YMITOS, a 33,186 ton cargo ship, collided in the Southwest Pass, a shipping lane south of New Orleans, Louisiana. The waters in which the collision occurred are governed by navigation “traffic laws” known as COL-REGS, 33 U.S.C. § 1602 et seq. (International Regulations for Preventing Collisions at Sea, 1972).
The NOORDAM was inbound heading northward, returning from a tour of the Caribbean. The MOUNT YMITOS was outbound heading southward, leaving for a trip to St. Petersburg, Russia. The MOUNT YMITOS was in the shipping lane to the east of the NOORDAM; the vessels were starboard side to starboard side. The NOOR-DAM did not become aware of the MOUNT YMITOS’s position until 90-120 seconds before the collision. Initially, the MOUNT YMITOS was off the NOORDAM’s starboard side showing only green lights to the NOOR-DAM.[1] The NOORDAM, therefore, could have concluded that the ships would safely make a starboard-to-starboard pass. However, shortly thereafter, the MOUNT YMI-TOS made a sudden starboard turn at high speed. Instead of seeing green lights, the NOORDAM now saw only red lights. In order to avoid the collision, the NOORDAM made a hard turn to port, but it was too late. The vessels collided.
The district court conducted a nine day bench trial to determine fault. The court’s factual findings were reached with considerable difficulty:
All areas of this litigation have been hotly contested and not even the location of the impact could be agreed to by counsel for the parties. If the Court accepted the position forwarded by each side, this collision would have never happened!;] in fact, there would have been approximately one mile to spare. Unfortunately, that is not the case and this Court has been put in the uncomfortable posture of making critical factual decisions based upon conflicting and limited evidence. Credibility of the witnesses and the credibility of the vessels’ documentation were the deciding factors for the Court in this litigation.
The court apportioned 90% of the fault to the MOUNT YMITOS and 10% to the NOOR-DAM. The MOUNT YMITOS timely appealed.[2]
DISCUSSION
1. Standard of Review
A district court’s findings of fact are reviewed for clear error. See Fed.R.Civ.P. *451 52(a); Burma Navigation Corp. v. Reliant Seahorse MV, 99 F.3d 652, 656-57 (5th Cir.1996). “Where the court’s finding is based on its decision to credit the testimony of one witness over that of another, ‘that finding, if not internally inconsistent, can virtually never be clear error.’ ” Id. at 657. Questions of negligence, proximate cause, and allocation of fault are normally factual questions. See id.
2. Discussion
A. Custom of starboard to starboard passing
The district court found that in the area in which the collision occurred, there exists a custom of passing starboard to starboard. MOUNT YMITOS along with the Associated Branch Pilots, appearing as amicus curiae, argue that the district court erred by declaring a custom of starboard to starboard passing in the area of the Southwest Pass. We agree.
As a general matter, “[c]ourts do not favor giving effect to local customs involving deviations” from the rules of navigation, and they make an exception only when the customs “are firmly established, and well understood.” The Giove, 27 F.2d 331, 332 (5th Cir.1928). “A custom will be recognized only if it does not conflict with the rules of navigation. Custom that contradicts a statutory rule of navigation will not be enforced.” 2 Thomas J. Sehoenbaum, Admiralty and Maritime Law § 14-2, at 260-61 (1994). The COLREGS and other navigational statutes are binding enactments that must be adhered to closely. See id. at 256. COLREG 14 provides that vessels will ordinarily pass port to port. Because this collision occurred within an area governed by the COLREGS, the superposition of a starboard-to-starboard passing “custom” could be confusing.[3] Moreover, the custom found by the district court in this case is not published. There is highly contradictory testimony concerning the existence or nonexistence of this alleged custom in this waterway. Accordingly, we hold that the district court clearly erred by finding a custom of passing starboard to starboard, and we reverse on this issue. The district court, however, declined to assess liability based upon its conclusion that the MOUNT YMITOS failed to follow this alleged local custom. The court’s fault findings principally depend upon the applicability or inapplicability of the COLREGS to this fact situation. Our disagreement with the court’s finding of a custom will not impugn its ultimate judgement.
B. Applicability of the COLREGS
Applying the COLREGS, the district court found that the MOUNT YMITOS was overwhelmingly respdnsible for the vessels’ collision because the MOUNT YMITOS violated COLREG' 7(b) (proper use of radar equipment); COLREG 2 (responsibility and good seamanship); COLREG 8 (failure to take action to avoid collision); and COLREG 17 (failure to maintain course and speed or make other passing arrangements with the NOORDAM). Compare Acacia Vera Navigation Co. v. Kezia, Ltd., 78 F.3d 211 (5th Cir.1996).
In assessing the NOORDAM’s responsibility for the collision, the district court ruled that “the NOORDAM should have kept a better lookout both visually and with' the highly sophisticated equipment onboard.” The . court then concluded that the NOOR-DAM’s “one failing” was that it had violated COLREG 7(b) because it failed to use her radar system properly to take advantage of an early warning of the MOUNT YMITOS’s approach and take evasive maneuvers to avoid the collision.
MOUNT YMITOS contends that the district court erred at a minimum by not finding that because the NOORDAM had not maintained a proper visual lookout, she also violated.COLREG 5.[4] Although this is peeu- *452 liar, we find no reversible error, as the court decided that the NOORDAM’s failure to maintain a proper lookout was not a proximate cause of the collision:
The Court holds that NOORDAM should have kept a better lookout both visually and with the highly sophisticated equipment onboard.... The Court does not believe that this was the proximate cause of the collision; however, the Court is satisfied that if NOORDAM had kept a better lookout, visually and through ARPA/radar, she would have been aware of the location and maneuvers of MOUNT YMITOS.
After reviewing the record, we cannot say that the district court clearly erred in concluding that the NOORDAM’s mistakes were not a proximate cause of the collision. See Burma Navigation Corp., 99 F.3d at 657. There is sufficient evidence to support the district court’s conclusion that the proximate cause of the collision was the poor seamanship of the MOUNT YMITOS and her imprudent turn to starboard moments before the collision. See Acacia Vera, supra.
By the same token, the court’s failure to find other COLREG violations on the part of the NOORDAM is also supported by the record. For instance, we decline to disturb the district court’s implicit finding that the NOORDAM did not violate COLREG 14. The position of the two ships in this case was determined only after the district court was “put in the uncomfortable posture of making critical factual decisions based upon conflicting and limited evidence,” and we do not find clear error in its conclusions.
C. Apportionment of Liability
MOUNT YMITOS next asserts that the court misapplied principles of comparative fault. In maritime collision cases, the court must allocate liability proportionate to the comparative degrees of the parties’ fault. See United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 1715-16, 44 L.Ed.2d 251 (1975).
The court apportioned 90% of the fault to the MOUNT YMITOS and 10% to the NOORDAM. It based this conclusion on its evaluation of the testimony of numerous witnesses, the NOORDAM’s ship logs, and the fact that the log books of the MOUNT YMI-TOS had been significantly altered. See Andros Shipping Co. v. Panama Canal Co., 184 F.Supp. 246, 259 (D.C.Z.1960) (“The unexplained alteration of a ship’s record of maneuvers ‘not only cast[s] suspicion on the whole case of the vessel, but creates a strong •presumption that the erased matter was adverse to her contention.’ ” (quoting The Silver Palm, 94 F.2d 754, 762 (9th Cir.1937))). A thorough review of the record is persuasive that the district court did not misapply the principles of comparative fault, but its erroneous finding of a starboard-to-starboard passing custom may have influenced the allocation.[5] See Hellenic Lines, Ltd. v. Prudential Lines, Inc., 730 F.2d 159 (4th Cir.1984).
CONCLUSION
For the foregoing reasons, we reverse the district court’s finding of a custom of passing starboard to starboard in the waterways in which the collision occurred. The judgment is VACATED and REMANDED to afford the district court the opportunity to reapportion liability.
VACATED and REMANDED.

. A ship has green lights on her starboard side and red lights on her port side for identification. Therefore, when one approaches a ship head-on, one sees both green and red lights. If one sees only the starboard side of a ship, one would see only green lights.

. The appellants filed this case originally as an interlocutory admiralty appeal under 28 U.S.C. § 1292(a)(3) from the district court’s interlocutory judgment on liability entered on November 29, 1996. After full briefing and oral argument before this court, the trial of the damages portion of the case proceeded in the district court. On March 31, 1998, the district court entered judgment as to the amount of damages thereby entering final judgment in this action. At the parties’ request and because the final judgment does not raise new issues in this appeal, the record in this case has been supplemented to include the March 31, 1998, judgment and the district court’s Order and Reasons. The actions have been consolidated, and this appeal is now from a final judgment.

. Even though the finding of a “custom” does not have the force of law, invariably applicable to each case, see Canal Barge Co. v. China Ocean Shipping Co., 770 F.2d 1357, 1361 (5th Cir.1985), we are concerned lest the district court's finding of a custom in dubious circumstances like these may take on a life of its own.

. COLREG 5 mandates that all vessels "at all times maintain a proper look-out ... so as to make a full appraisal of the situation and the risk of collision.”

. MOUNT YMITOS also objects to the district court's refusal to admit evidence of the conclusions reached after investigations by the Coast Guard, the National Transportation Safety Board, and the Dutch NSI. There was no abuse of discretion, however, given that no rule requires admission of these reports.