# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30059

United States Court of Appeals
Fifth Circuit

**FILED**

March 2, 2015

Lyle W. Cayce
Clerk

OFFSHORE MARINE CONTRACTORS, INCORPORATED,

Plaintiff - Appellee

v.

PALM ENERGY OFFSHORE, L.L.C.,

Defendant - Appellee

v.

CHET MORRISON WELL SERVICES, L.L.C.,

Defendant - Appellant

-----------------------------------------------------------------------------------------------------

CHET MORRISON CONTRACTORS, L.L.C.,

Plaintiff - Appellant

v.

PALM ENERGY OFFSHORE, L.L.C.; H.C. RESOURCES, L.L.C.,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

No. 14-30059

EDITH BROWN CLEMENT, Circuit Judge:

Appellants Chet Morrison Well Services, L.L.C. and Chet Morrison Contractors, L.L.C. (collectively, "CM") appeal the order and reasons, judgment, and post-trial order entered by the district court on October 7, 2013, October 17, 2013, and December 30, 2013, respectively. For the reasons explained below, the district court's judgment and post-trial order are AFFIRMED.

## FACTS AND PROCEEDINGS

Appellee Palm Energy Offshore, L.L.C. ("Palm") owned the mineral rights in an area of the Gulf of Mexico ("Gulf") called the West Delta 55 block ("WD55"). Palm also served as the court-appointed manager for appellee H.C. Resources, L.L.C. ("HCR") and its mineral holdings at another Gulf location, the Chandeleur 37 block ("C37"). Acting as HCR's manager, Palm asked CM to service one of HCR's wells at C37. CM agreed and chartered the L/B Nicole Eymard (the "Nicole Eymard") from appellee Offshore Marine Contractors, Inc. ("Offshore") beginning on July 15, 2008. The Nicole Eymard is a lift boat, a vessel with extendable legs that allow the ship to stabilize on the ocean floor to perform maintenance work at sea.

The ship departed Louisiana on July 18 and worked at C37 until July 27. On July 27, Palm, now acting on its own behalf, asked CM to send the Nicole Eymard to WD55. CM dispatched the ship to WD55. After completing the job at WD55, the crew of the Nicole Eymard attempted to retract the ship's legs from the ocean floor. The crew discovered that one of the legs was stuck. The crew worked to free the leg until August 18, when Offshore ordered the crew to sever the leg and return to port ahead of an approaching storm. In port, Offshore completed repairs on the ship on October 10. Offshore then sued CM and Palm for charter fees that accrued from July 15 to August 18, for "downtime charter" from August 19 to October 10, and for the cost of repairs.

2

No. 14-30059

CM and Palm then filed various counter- and cross-claims against each other and Offshore. CM and Offshore's claims against each other are governed in part by the terms of an oral charter agreement. CM and Palm's claims against each other are governed in part by the terms of a Master Service Agreement ("MSA"), and in part by a specific work order. The MSA contains an indemnity agreement ("Indemnity Agreement").

After a bench trial, the district court held that CM owed Offshore for charter fees that accrued from July 15 to July 27 while the Nicole Eymard was at C37, and for charter fees that accrued from July 28 to August 18 while the ship was at WD55. The court held that CM could recover the same fees from Palm. The court held that neither CM nor Palm owed Offshore for downtime charter fees from August 19 to October 10, or for repairs. The court held that CM and Palm owed prejudgment interest to Offshore and CM, respectively. The court further held that, under the Indemnity Agreement, CM owed Palm attorneys' fees and costs, which Palm incurred while defending against Offshore's claims.

CM, Offshore, and Palm filed motions to alter or amend the judgment under Fed. R. Civ. P. 59.[1] The court granted these motions to the extent they sought clarification regarding the court's order on prejudgment interest. The court explained that CM was liable to Offshore, and Palm to CM, for prejudgment interest at the rate of 1.5% per month. The court granted Palm's motion in part, holding that Palm did not owe CM for on-site downtime charter fees that accrued from August 1 to August 18 while the Nicole Eymard was stuck at WD55. The court determined that the Indemnity Agreement barred CM from seeking repayment for those fees. The court denied the parties' motions in all other respects.

---

[1] CM also cited Rule 60 as a basis for its motion.

No. 14-30059

CM appeals from the district court's judgment and its post-trial order.

## STANDARD OF REVIEW

In admiralty cases tried without a jury, we review the district court's legal conclusions de novo and its factual findings under the clearly erroneous standard. *Stevens Shipping & Terminal Co. v. Japan Rainbow II MV*, 334 F.3d 439, 443 (5th Cir. 2003). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on all of the evidence, is left with the definite and firm conviction that a mistake has been made." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 363 (5th Cir. 2006). "If the district court's account of the evidence is plausible in light of the record, this Court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 363-64.

"If a finding is based on a mixed question of law and fact, this court should only reverse 'if the findings are based on a misunderstanding of the law or a clearly erroneous view of the facts.'" *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 259 (5th Cir. 2006) (quoting *Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001)).

"Interpretation of the terms of a contract, including an indemnity clause, is a matter of law, reviewable *de novo* on appeal." *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013) (internal quotation marks omitted). Because the MSA and relevant work orders are "directly and proximately linked to a vessel involved in a maritime activity," general maritime law controls our interpretation of those agreements. *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 539 (5th Cir. 1986); *cf. Reynaud v. Rowan Co.*, No. Civ. A. 98-1326, 1999 WL 65022, at *2 & n.3 (E.D. La. Feb. 5, 1999) (Clement, J.) (holding that contract to supply jackup rig was maritime in nature). Because the MSA contains a Louisiana choice of law provision, and the work in this case

4

No. 14-30059

was performed in Louisiana territorial waters, we apply Louisiana law when interpreting the MSA. *See Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 243-44 (5th Cir. 2009) (holding that choice of law provision in maritime contract applies unless party opposing provision shows chosen state has "no substantial relationship to the parties or the transaction," or "state's law conflicts with the fundamental purposes of maritime law").[2]

## DISCUSSION

### I.

CM argues that the district court erred by finding that it was barred under the Indemnity Agreement from seeking repayment from Palm for charter fees that accrued from August 1 to August 18 while the Nicole Eymard was stuck at WD55.

As explained above, the Indemnity Agreement is part of the MSA. Thus our interpretation of the Indemnity Agreement is governed by Louisiana law. Under Louisiana law, "[t]he starting point for interpreting an indemnity provision is the language of the contractual provision." *Scarberry v. Entergy Corp.*, 136 So. 3d 194, 218 (La. Ct. App. 2014). "If the words of the contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the true intent of the parties." *Boykin v. PPG Indus., Inc.*, 987 So. 2d 838, 842 (La. Ct. App. 2008) (citing and summarizing La. Civ. Code art. 2046). The Indemnity Agreement provides that CM "shall release, defend, protect, indemnify, and hold [Palm] harmless . . . from and against all suits, actions, claims, liabilities, damages, and demands based upon personal injury or death or property damage or loss . . . suffered by" CM or its subcontractors.

---

[2] Neither party argues that these exceptions apply.

No. 14-30059

In its October 7 order, the district court held that CM owed Offshore for charter fees that accrued from July 28 to August 18 while the Nicole Eymard was at WD55. *See Offshore Marine Contractors, Inc. v. Palm Energy Offshore, LLC* (*Offshore I*), No. 10-CV-4151, 2013 WL 5530273, at *7 (E.D. La. Oct. 7, 2013). The court further held that Palm had agreed to pay CM for those fees. *See id.* at *7-8. In its post-trial order, the district court affirmed its earlier holding to the extent that Palm still owes CM for charter fees that accrued while the Nicole Eymard was *working* at WD55. But the court held that the on-site downtime charter fees that accrued only because the Nicole Eymard was stuck on location were based on "property damage or loss," and thus "f[e]ll within the terms of the release" in the Indemnity Agreement. *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, LLC* (*Offshore II*), No. 10-CV-4151, 2013 WL 6858911, at *6 (E.D. La. Dec. 30, 2013). Accordingly, the court held that Palm "[wa]s not liable to [CM] for charter fees during the period in which the Nicole Eymard was stuck [at WD55] (August 1, 2008 to August 18, 2008)." *Id.*

CM's argument turns on the meaning of the phrase "based upon . . . property damage or loss." In CM's view, the fact that its claim against Palm is for charter fees means that the claim cannot be based on property damage. But CM fails to recognize that the Indemnity Agreement covers not only claims based on "property damage" but also those based on "loss." Indemnification is required for claims "based upon personal injury or death or property damage or loss." Only damage is modified by "property." As used in the Indemnity Agreement, "loss" is general and not modified by "property."[3]   The on-site

---

[3] Where "property" is intended to modify both "damage" and "loss," the Indemnity Agreement makes the modification explicit. For example, the Indemnity Agreement provides that CM must provide comprehensive general liability insurance that covers "personal injury, sickness or death, and loss or damage to property." Elsewhere, it provides that Palm will pay CM for "damage to or loss of [CM's] downhole property or equipment."

downtime charter fees were a "loss," which is covered by the Indemnity Agreement.

We agree with the district court's interpretation of the Indemnity Agreement, and we discern no error in the district court's understanding of the relevant facts.

## II.

CM argues that Palm breached its agreement to pay charter fees directly to Offshore, and that this breach precludes Palm from collecting attorneys' fees and costs from CM under the Indemnity Agreement.[4]

In *Offshore II*, the district court held that Palm never agreed to pay Offshore directly for the charter fees that accrued at WD55. *Id.*, 2013 WL 6858911, at \*5. If Palm never agreed to pay Offshore directly, then no breach could have occurred. CM cites evidence that suggests that Palm agreed to pay Offshore directly. But the district court credited conflicting evidence that Palm never agreed to pay directly for the WD55 job. *See Offshore I*, 2013 WL 5530273, at \*5 ("Williams [of CM] maintained that the [WD]55 project was supposed to be another direct billing arrangement, but Garrett [of Palm] testified that direct billing was never discussed." (footnote omitted)). CM fails to point to any evidence showing that the district court's balancing of the conflicting evidence was unreasonable.

Accordingly, CM fails to show that the district court clearly erred by crediting the evidence showing that there was no direct billing agreement.

## III.

---

[4] Palm moves the court to strike portions of CM's reply brief suggesting that Palm never paid for the charter hire of the Nicole Eymard. Because, even considering those portions of CM's brief, CM fails to show that the district court clearly erred, we dismiss Palm's motion as moot.

CM argues that the district court erred by failing to award it a 15% markup on all charter fees owed by Palm.

CM's strongest evidence is a corporate deposition of a Palm executive, Jonathan Garrett ("Garrett"). Opposing counsel asked Garrett:

> Well, let's just say the Court determines -- you've already told us that you committed to pay the charter hire, whatever was the reasonable charter hire.
>
> My question to you is: With your relationship with Chet Morrison, was your agreement to pay the charter hire plus 15 percent for this job on West Delta 55?

Garrett responded: "That's the -- yes, that's given --." This testimony suggests that CM and Palm had a blanket agreement that Palm would pay the markup whenever CM chartered vessels on its behalf. But at trial, Garrett testified that Palm never "issue[d] a blanket statement to [CM] that [it] would pay any and all invoices with a 15 percent markup" and that Palm "reserv[ed] the right to audit [CM's] invoice." A district court does not clearly err merely because it credits one of two conflicting testimonies. *Cf. United States v. Davis*, 76 F.3d 82, 85 (5th Cir. 1996) ("We see no error in the district court's determination that Wilson's cross-examination testimony was more worthy of credence than his direct testimony. . . ."). Moreover, we note that the district court's resolution of these conflicting testimonies was especially reasonable in this case, where the deposition question was convoluted and hypothetical, while the question at trial was clear and direct.

CM points to evidence that Palm paid a CM invoice that contained the markup. But CM concedes that the payment was later refunded, and other testimony suggests that Palm paid the invoice "accidentally." CM also points to testimony that Palm had paid CM the markup in the past. But the trial testimony cited above suggests that past markup payments were not promises to pay in the future.

Finally, CM adduced evidence that it is customary for its customers to pay a markup. But "before a custom or usage will be considered binding by implication, the practice must appear to have been generally applicable as to the place in question or in reference to the particular trade with which it is connected." Richard A. Lord, 12 Williston on Contracts § 34.14 (4th ed. 2014). Such "binding effect . . . cannot be based on a few isolated instances, or the practice of a few persons in a business or trade in which numerous persons are engaged." *Id.*

Accordingly, CM fails to show that the district court clearly erred when it determined that Palm did not owe the markup payments.

## IV.

CM argues that the district court clearly erred when it awarded prejudgment interest to Offshore at the rate of 1.5% per month because it never agreed to pay that rate. CM also contends that this case presents special circumstances that require an exception to the general rule that prejudgment interest applies.

"Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986). "Admiralty courts enjoy broad discretion in setting prejudgment interest rates. They may look to the judgment creditor's actual cost of borrowing money, to state law, or to other reasonable guideposts indicating a fair level of compensation." *Gator Marine Serv. Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096, 1101 (5th Cir. Unit A July 1981) (internal citations omitted).

The district court set the interest rate based on Offshore's invoices. In doing so, the district court did not abuse its discretion. Courts often look to invoices when fixing prejudgment interest. *L&L Oil Co. v. M/V REBEL*, 96 F.3d 1445 (5th Cir. 1996) (unpublished table decision) (noting that district

court properly awarded interest based on rate called for in invoices); *Eagle Eye Distrib., Inc. v. Ben Parker, Inc.*, No. 3:09-CV-0095-L, 2009 WL 4251105, at *9 (N.D. Tex. Nov. 25, 2009) (looking to invoices to set 1.5% per month prejudgment interest rate). Courts award these amounts to "compensate[ ] for the use of funds to which the plaintiff was entitled, but which the defendant had use of prior to judgment," not on the grounds that the parties specifically agreed to the interest rate. *Reeled Tubing*, 794 F.2d at 1028. CM's argument that it never agreed to the invoice rate is irrelevant.

CM argues that special circumstances require an exception to the prejudgment interest rule. More specifically, CM contends that Offshore delayed litigation from 2008 to 2010. But the record shows that CM caused this delay, at least in part, by instructing Offshore to bill Palm directly. CM maintains that the district court should not have ordered payment of any interest rate higher than the federal interest rate, but it fails to cite any support for this assertion. CM argues that the prejudgment interest rate leads to an award that is far higher than Offshore could have earned on the withheld payments. Once again, CM fails to cite any support for this assertion. Finally, CM asserts that the district court's award ignores all of the *Reeled Tubing* factors. This general assertion is insufficient to show that the district court abused its discretion.

Accordingly, CM fails to show that the district court abused its discretion when it awarded Offshore prejudgment interest at the rate of 1.5% per month.

## CONCLUSION

For the reasons explained, the district court's judgment and post-trial order are AFFIRMED.