# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 23, 2010

Lyle W. Cayce
Clerk

No. 09-30055

CRESCENT TOWING & SALVAGE COMPANY INC; COOPER
CONSOLIDATED INC,

Plaintiffs–Appellees Cross–Appellants

v.

CHIOS BEAUTY MV, her engines, boilers, tackle, apparel, etc, in rem;
HARBOR SHIPPING AND TRADING S A; CHIOS BEAUTY SHIPPING
AND TRADING SA,

Defendants–Appellants Cross–Appellees

Appeals from the United States District Court
for the Eastern District of Louisiana

Before GARWOOD, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Plaintiffs brought suit against the CHIOS BEAUTY M/V and her owner and operator (together, "Defendants") for damages sustained when the ship allided with Plaintiffs' barges and tugboats, which were moored in the Mississippi near New Orleans during Hurricane Katrina. The district court found that the Defendants were negligent when they brought CHIOS BEAUTY into New Orleans in the face of the impending storm. The district court also

denied the Plaintiffs' motion to permit recovery of post-judgment interest in excess of the letter of undertaking agreed to by the parties. We affirm the judgment of the district court as to the standard of care it employed and its factual findings, and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEEDINGS

At 6:30 a.m. CDT on August 25, 2005, CHIOS BEAUTY left Vera Cruz, Mexico, bound for New Orleans, where it was scheduled to load a cargo of grain. Her master was Captain Nikolaos Ntouslazis, who had received his master's license in 2003. The ship was equipped with NAVTEX, a dedicated receiver providing worldwide weather reports, as well as IMARSAT, which provides satellite-based weather information. At the time CHIOS BEAUTY embarked, Ntouslazis mistakenly believed that Tropical Storm Katrina was near the Virgin Islands. Katrina was actually northwest of the Bahamas, and she strengthened into a hurricane later that day.

CHIOS BEAUTY was owned by Chios Shipping, a Panamanian corporation, and was operated by Harbor Shipping & Trading, S.A. ("Harbor Shipping"). Harbor Shipping's agent in New Orleans was Sunrise Shipping Agency, Inc. ("Sunrise"). On August 26, 2005, a Sunrise representative asked a representative of Harbor Shipping whether the operator wanted the ship to continue to New Orleans. Harbor Shipping instructed Sunrise to bring the ship into New Orleans, because "we don't know where the storm is going."

The National Hurricane Center ("NHC") issued two advisories on August 26 that predicted the hurricane would make landfall somewhere within a 400-mile stretch of coastline that included New Orleans. At 4:00 a.m. the next day, NHC issued another advisory that placed New Orleans in the center of the area Katrina was predicted to hit. At 8:30 a.m. that same morning, CHIOS BEAUTY arrived at Southwest Pass, the navigable mouth of the Mississippi. Twenty-five

minutes after she took on a pilot and entered the river, NHC issued a hurricane watch for an area that included New Orleans. A representative of Harbor Shipping later testified that he did not consider diverting CHIOS BEAUTY, because "everybody believed that the cool waters of the Mississippi would not . . . let the [hurricane] head toward New Orleans." Later that day, the ship moored at a wharf opposite several barges and tugboats owned by Plaintiffs. When Katrina hit, the ship's lines snapped before the winds reached hurricane force. The storm surge carried CHIOS BEAUTY across the river, where it allided with the Plaintiffs' barges and grounded several tugboats.

Plaintiffs filed suit against the CHIOS BEAUTY in rem, Harbor Shipping, and Chios Shipping, seeking damages resulting from the allision. The district court ordered the ship's arrest and Defendants obtained a letter of undertaking to secure its release. This letter provided that the American Owners Mutual Protection and Indemnity Association, Inc. ("the Association") undertook to pay Plaintiffs any

> sum . . . which either may be agreed between the parties and approved by the Association, or which is adjudged to be due . . . in the matter pending in the . . . District Court . . . from the Vessel, in rem, and/or its Owner by final judgment . . . provided that the total of our liability hereunder shall not exceed the sum of US$3,750,000.00 . . . inclusive of interest and costs.

The letter also provided that Plaintiffs' "right to challenge the sufficiency of the security is reserved" and that the security could be "increased or decreased by agreement of the parties or, failing such agreement, by Order of a Court or Tribunal of competent jurisdiction." The letter was to be "governed by and construed in accordance with maritime Law." This letter was negotiated after the arrest of the vessel and memorialized on September 12, 2005, prior to any appraisal of the vessel.

No. 09-30055

The district court held a five-day bench trial in 2008 and found in favor of Plaintiffs. It credited the testimony of Plaintiffs' expert that CHIOS BEAUTY "should not have entered the Port of New Orleans with Hurricane Katrina predicted to strike New Orleans." Additionally, it found that the "weather information considered by Harbor Shipping and Captain Ntouslazis was grossly insufficient in scope, and their understanding of the weather information was also inadequate." The district court determined that Defendants "had ample time and information to know not to endanger the vessel by bringing it into the Port of New Orleans." Based on these findings, the district court concluded that Defendants had been negligent "by failing to prudently monitor and interpret the available weather information concerning Hurricane Katrina and for sailing the vessel into the Port of New Orleans and directly into the path of Hurricane Katrina" when there was sufficient time to divert to a safe port in the western Gulf of Mexico.

In the same order, the district court increased the amount of the security provided by the Association's letter of undertaking to $5.5 million, which it found to be the value of CHIOS BEAUTY. Final judgment was entered making Defendants jointly and severally liable to Cooper Consolidated for $279,000.00 and to Crescent Towing for $4,638,487.40, but capping in rem recovery at $5,500,000.00. The judgment provided for pre-judgment interest from August 29, 2005 to August 15, 2008, and post-judgment interest thereafter pursuant to 28 U.S.C. § 1961. The district court granted the Defendants' motion for an amended judgment in part by setting the rate of pre-judgment interest at 4 percent, but refused to alter the standard of care to which it had held the Defendants.

In August 2009, the Plaintiffs filed a motion to amend the judgment to provide that interest on the judgment could run against CHIOS BEAUTY in rem in excess of $5.5 million. The district court denied the motion on the ground that the letter of undertaking provided that security on the vessel would be "inclusive

4

No. 09-30055

of interests and costs." Thus, it found that Plaintiffs' total in rem recovery was limited to $5.5 million and that they could not collect interest in excess of this amount. The district court entered its final amended judgment on May 4, 2009, awarding Plaintiffs $4,726,601.15 in damages, plus pre- and post-judgment interest, but limiting in rem recovery to $5.5 million. Both sides timely appealed. We denied post-appeal motions by Plaintiffs to supplement the record with an updated letter of undertaking and by Defendants to supplement it with three Katrina "Strike Probability" charts issued by the NHC before the storm made landfall.

**STANDARD OF REVIEW**

In admiralty cases, we review de novo whether the district court applied the correct standard of care. *Theriot v. United States*, 245 F.3d 388, 400 (5th Cir. 1998). We review a district court's factual findings for clear error. *Id.* at 394. A finding is "clearly erroneous" when, although there may be evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id.* at 395. The district court's finding that the Defendants were negligent is itself a finding of fact, which will not be set aside unless it is clearly erroneous. *Id.* at 400.

A district court's interest award is a question of law, which we review de novo. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 435 (5th Cir. 2003).

**DISCUSSION**

A.    **Standard of Care**

The Defendants claim that the district court erred in applying a regular negligence standard of care, rather than the heightened *in extremis* standard, in judging whether Ntouslazis was negligent in continuing to New Orleans rather than running for safety elsewhere in the Gulf.

"It has long been the law that errors in judgment committed by a vessel put in sudden peril through no fault of her own are to be leniently judged. . . .

5

No. 09-30055

Courts are not supposed to second guess parties in peril and expect from them the most precise judgments." *Union Oil Co. of Cal. v. Tug Mary Malloy*, 414 F.2d 669, 674 (5th Cir. 1969). "[W]here, without prior negligence, a vessel is put in the very center of destructive natural forces and a hard choice between competing courses must immediately be made, the law requires that there be something more than mere mistake of judgment by the master in that decision *in extremis*." *Employers Ins. of Wausau v. Suwannee River SPA Lines, Inc.*, 866 F.2d 752, 771 (5th Cir. 1989) (quoting *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84 (5th Cir. 1960)). However, the *in extremis* standard of care should not be applied to the actions of a captain who had ample time to avoid the peril. *See Boudoin*, 281 F.2d at 84-86 (*in extremis* standard does not apply to captain who had time to choose a safer berth before hurricane struck).

Ntouslazis had ample time to find a safer berth and was not in a position of peril at the time he decided to proceed to New Orleans. When CHIOS BEAUTY took aboard a pilot at Southwest Pass, Katrina was not predicted to make landfall for another two days, which gave the captain ample time to run to a safer port in the western Gulf. Prior to the ship entering Southwest Pass, NHC issued an advisory showing New Orleans at dead center of the storm's projected landfall. Ntouslazis had access to continuously updated weather information through his NAVSTAR and IMARSAT systems and could have acted upon this information. *See id.* at 85 (noting that it is incumbent upon "a competent shipmaster [to] evaluate data continuously"). The Plaintiffs' expert testified that CHIOS BEAUTY should not have entered the Mississippi given the impending weather conditions, and the district court found this testimony credible. None of the factual findings that support the district court's rejection of the proposed *in extremis* standard of care are clearly erroneous. The district court applied the correct standard of care.

6

No. 09-30055

## B.    Factual Findings

The Defendants also attack several factual findings made by the district court, as well as the overall factual finding of negligence.

First, the Defendants attack the district court's repeated assertion that New Orleans was predicted to receive a "direct hit" from Hurricane Katrina. In ¶17 of its factual findings, the district court found that "Hurricane Advisory 16 issued by the National Hurricane Center . . . predicted a course that would have the storm striking New Orleans directly." The district court repeated this finding several times, and it was the basis of several other findings of fact that the district court made. This finding of fact was also the basis of testimony the district court elicited from the Plaintiffs' navigation expert, who was asked to opine whether it was negligent to proceed to New Orleans in the face of advisories forecasting a landfall at Buras, Louisiana. The expert replied that it was negligent and the district court credited this testimony. The Defendants argue that this opinion was not based on "sufficient facts or data" within the meaning of Rule 702 of the Federal Rules of Evidence, because the advisories do not forecast a direct hit on New Orleans or landfall at Buras.[1] This finding of a likely "direct hit" was also critical to the district court's ultimate finding that Ntouslazis  was negligent "by failing to prudently monitor and interpret the available weather information concerning Hurricane Katrina and for sailing the vessel into the Port of New Orleans and directly into the path of Hurricane Katrina."

This finding by the district court is not clearly erroneous. The advisories in question, especially Advisory 16—the last one issued before CHIOS BEAUTY entered the Mississippi—clearly forecast the center of Hurricane Katrina

---

[1] The Plaintiffs' expert offered substantially the same opinion based on the actual facts of the case, rather than in response to a hypothetical, during his direct testimony and during his cross examination.

passing near or directly over New Orleans.[2] These advisories are obviously predictions and are subject to uncertainty. But they were the best available forecast of Katrina's path at the time Ntouslazis decided to proceed to New Orleans. We affirm the judgment of the district court as to its finding of a predicted "direct hit" on New Orleans, its factual findings based on this finding, and the ultimate finding of negligence to the extent that it relies upon this finding.

## C.    In Rem Interest

The district court denied Plaintiffs' post-judgment motion to increase the amount of the letter of undertaking to $5,690,000 to permit recovery of post-judgment interest pursuant to 28 U.S.C. § 1961. The district court found that language in the letter limiting recovery to $5.5 million "inclusive of interests and costs" constituted waiver of in rem recovery of post-judgment interest. Plaintiffs cross-appealed this order.

Pursuant to Rule E(5) of the Supplemental Rules for Admiralty and Maritime Claims, release of an arrested vessel may be effected upon posting of a special bond to cover "the amount of the plaintiff's claim fairly stated with accrued interest and costs." Rule E(5)(a) provides two avenues to effect such a release. First, the "parties may stipulate the amount and nature of such security." Second, "[i]n the event of the inability or refusal of the parties so to stipulate the court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs." If fixed by the court, the principal sum should be the lesser of the value of the vessel or twice the amount of plaintiff's claim. However,

---

[2] The Defendants also repeatedly draw the court's attention to "Strike Probability" charts showing that the chance of a direct hit on New Orleans was 10-19 percent. We have previously declined to consider these charts, which were not before the district court when it issued its findings of fact, and we again decline to do so.

whether fixed by the parties or by the court, "[t]he bond or stipulation shall be conditioned for the payment of the principal sum and interest thereon at 6 per cent per annum."

Defendants claim that Plaintiffs' in rem recovery of both damages and interest is capped at $5.5 million by the letter's provision limiting liability to a sum certain "inclusive of interests and costs." This language, they argue, constitutes waiver of Plaintiffs' statutory right to a bond or stipulation conditioned on payment of the principal sum plus 6 percent interest per annum. Plaintiffs argue that the letter was not a stipulation as to the principal sum, pointing to language permitting increase or decrease in the security by agreement of the parties or order of the district court. The letter of undertaking did not waive Plaintiffs' right to condition the letter of undertaking on accrual of Rule E(5) interest, they argue.

Considering how common letters of undertaking are in the vessel seizure context, there are surprisingly few cases interpreting them. The few that do apply standard contract principles and specifically enforce their provisions. *See, e.g.*, *Chiquita Int'l Ltd. v. Liverpool & London Steamship Prot. & Indem. Ass'n Ltd.*, 124 F. Supp. 2d 158 (S.D.N.Y. 2000). Applying such principles, we cannot agree that the "inclusive of interests and costs" provision of this letter constitutes a waiver of Rule E(5) interest on a letter of undertaking. As the district court found in ¶ 69 of its findings of fact, the "letter of undertaking contains no definitive stipulation of value." In fact, the parties disagreed vigorously as to the value of the vessel and eventually left it to the court to determine value and set the principal sum. The "inclusive of interest and costs" language in the letter is consistent with the Rule E(5) mechanism allowing the district court to set the principal sum at an amount sufficient to cover Plaintiffs' claim with interest and costs accrued to date, but not exceeding the value of the vessel. By rule, once this amount is set and the vessel is released by a letter of

undertaking, that letter *shall* be conditioned for the payment of interest at 6 percent per year. This provision constitutes a gap-filling provision in any bond or letter of undertaking issued to secure the release of an arrested vessel. Regardless of whether this provision of Rule E(5) can be waived by consent of the parties, it was not waived here. We hold that the letter of undertaking in this case is conditioned on the payment of 6 percent interest per annum.

What complicates this case is that Plaintiffs asked for the wrong relief. Plaintiffs moved the district court to increase the value of the letter of undertaking to $5,690,000, an amount sufficient to permit in rem recovery of post-judgment interest. The district court properly denied this request, because the security provided by a letter of undertaking cannot exceed the value of the vessel, and a district court ordinarily should not increase the amount of security absent fraud, mistake, or misrepresentation, none of which are present here. *See Moore v. M/V ANGELA*, 353 F.3d 376, 385-86 (5th Cir. 2003). But there was no need to increase the value of the letter of undertaking, because by operation of Rule E(5), the letter is conditioned on the payment of 6 percent interest per annum and has been since it was memorialized on September 12, 2005. Out of the present value of this letter of undertaking, Plaintiffs can recover their damages, plus the pre-judgment interest awarded by the district court, plus the post-judgment interest to which they are entitled pursuant to 28 U.S.C. § 1961. Their recovery is limited, however, to the present value of the letter of undertaking; that is, Plaintiffs cannot recover a sum greater than the principal sum plus Rule E(5) interest accrued since September 12, 2005.

Accordingly, we remand the case to the district court to (1) determine the present value of the letter of undertaking, which is the principal sum of $5.5 million plus interest accrued on that amount at 6 percent per annum since September 12, 2005; (2) determine the present value of Plaintiffs' judgment, which is their damages, plus pre-judgment interest awarded by the district

No. 09-30055

court, plus post-judgment interest pursuant to § 1961; and (3) based on these calculations, enter an order setting the total amount of recovery Plaintiffs can recover in rem, which is the amount calculated in (2), subject to the maximum calculated in (1).

## CONCLUSION

Considering the foregoing, we affirm the judgment of the district court as to the standard of care it employed and its factual findings, and remand for further proceedings consistent with this opinion.