# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 21, 2013

No. 12-30474

Lyle W. Cayce
Clerk

MIKE HOOKS DREDGING COMPANY, INCORPORATED

Plaintiff-Third Party Plaintiff - Appellant

v.

MARQUETTE TRANSPORTATION GULF-INLAND, L.L.C., formerly known as Eckstein Marine Service, Incorporated; MEMCO BARGE LINE, L.L.C., in personam, doing business as AEP MEMCO L.L.C., doing business as AEP River Operations, L.L.C.; INGRAM BARGE COMPANY, in personam,

Defendants-Third Party Plaintiffs - Appellees

v.

LONGMAN'S MARINE SERVICE, INCORPORATED; TOMMIE VIZIER TOWING COMPANY, INCORPORATED; C & J MARINE SERVICES, INCORPORATED,

Third Party Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, GARZA, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This admiralty appeal challenges the district court's finding of liability arising from an allision in the Gulf Intracoastal Waterway ("ICW"). The dredge

No. 12-30474

MIKE HOOKS[1] was operating in the ICW under its contract with the Army Corps of Engineers when it was struck by a passing vessel, the PAT MCDANIEL,[2] while the dredge was moored on the bank of the narrow Wax Lake intersection undergoing repairs. We agree with the district court and hold that the MIKE HOOKS violated Inland Navigation Rule 9 ("INR 9") by mooring in a narrow channel; and that the violation triggered the rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1873), shifting the burden of proving causation to the dredge. Because Hooks failed to rebut the presumption of causation by demonstrating that the dredge was not a cause of the allision,[3] we AFFIRM the district court's judgment holding Hooks partially liable.

The district court apportioned liability for the allision among three parties: (1) Hooks (the MIKE HOOKS) was found 70 percent liable; (2) Eckstein (the PAT MCDANIEL) was found 30 percent liable; and (3) the Tommie Vizier Towing Company ("Vizier"), owner of the CAP'N TOMMIE VIZIER JR., was found "50 percent liable for Hooks's claims against Eckstein." The court's order further stated that "Eckstein is liable for a total of 15 percent of the damages and Vizier is liable for a total of 15 percent of the damages." We find that the district court committed no error in finding Hooks 70 percent liable and thus AFFIRM the allocation of fault.

I.

The MIKE HOOKS was moored on the north bank of the ICW near the intersection with the Wax Lake outlet undergoing repairs at the time of the

---

[1] The MIKE HOOKS was owned and operated by Mike Hooks Dredging Company, Inc. ("Hooks").

[2] The PAT MCDANIEL was owned and operated by Eckstein Marine Services, Inc. ("Eckstein"). Eckstein was the predecessor of Marquette Transportation Gulf-Inland, LLC.

[3] Black's Law Dictionary defines "allision" as: "The contact of a vessel with a stationary object such as an anchored vessel or a pier." BLACK'S LAW DICTIONARY 88 (9th ed. 2009).

allision.   The PAT MCDANIEL, along with its six barges, allided with the stationary dredge.  Hooks was operating the dredge in the ICW under a contract with the Army Corps of Engineers for the purpose of completing various dredging projects in the ICW.  The contract required Hooks to "provide one 1200hp towboat to serve as picket boat to assist passing traffic and/or to assist the dredge."  This provision applied when the dredge was going to be at certain project locations known to be dangerous.  The Wax Lake intersection was one such location.  At the time of the allision, Hooks had hired the CAP'N TOMMIE VIZIER JR. to serve as the dredge's picket boat.

Around 1:35 a.m. on May 31, 2008, the MIKE HOOKS arrived at the project location near the Wax Lake intersection and began setting up near the middle of the channel in anticipation of beginning operations.  The Wax Lake intersection is prone to dangerous currents and eddies.  Indeed, at 2:15 a.m., a vessel ran aground on the south bank, which the picket boat helped free.  And, between 3:50 and 4:20 a.m., two other vessels came "within inches from hitting the dredge."  Then, around 4:20 a.m., a tow, the SARAH D, collided with the MIKE HOOKS, causing a starboard-side hole.  The MIKE HOOKS subsequently was moved to the northwest corner of the Wax Lake intersection, and the crew began making repairs.[4]  Evidence did not conclusively establish the width of the channel where the MIKE HOOKS moored, but it was between 400 and 800 feet.

Despite the near misses with other vessels and the actual collision with the SARAH D, the MIKE HOOKS captain did not inform the approaching PAT MCDANIEL about the earlier incidents.[5]  And, due to high water and existing

---

[4] Trial testimony indicated that the dredge was basically on the bank, dropping its spuds around two feet in order to anchor.

[5] The only contact between the MIKE HOOKS and the PAT MCDANIEL appears to have been the formation of an agreement for the PAT MCDANIEL to "pass on the two whistles."  Testimony established that this phrase refers to a starboard passing agreement.

weather conditions, there was a stronger-than-normal current on May 31. Based on the current, in order for vessels successfully to navigate the Wax Lake intersection, they had first to steer toward the north bank so that when the current pushed them south they would not run aground on the south bank. The MIKE HOOKS's position thus caused westbound vessels, like the PAT MCDANIEL, to steer directly at the dredge to navigate the Wax Lake intersection.

Around 9:15 a.m., the PAT MCDANIEL allided with the dredge. The allision occurred during daylight, and visibility was good. The PAT MCDANIEL captain was aware of the relevant weather and current conditions when he decided to cross the Wax Lake intersection, but he remained unaware of the early morning incidents involving the MIKE HOOKS—evidence showed that there was very little, if any, communication among the MIKE HOOKS, the PAT MCDANIEL, and the picket boat. The PAT MCDANIEL captain testified that he misjudged the current and ultimately allided with the MIKE HOOKS.

The picket boat also played a role in the allision. The contract provision requiring Hooks to employ a picket boat to assist passing traffic meant that the picket boat physically had to assist the PAT MCDANIEL in avoiding the MIKE HOOKS.[6] In addition, Hooks knew that the picket boat would not physically assist passing traffic before the MIKE HOOKS was moved to the Wax Lake intersection. An earlier collision at a different location with another vessel had resulted in a discussion between the MIKE HOOKS and the picket boat about the need to aid passing vessels. The picket boat captain stated that he would communicate with passing traffic, but would not physically assist them. With

---

[6] At trial, Hooks took the position that physical assistance was not required under the contract, but this contention was not supported by any of the testimony, including from its own witnesses.

No. 12-30474

the knowledge that the picket boat would not provide physical assistance, the MIKE HOOKS nonetheless proceeded on to the Wax Lake intersection.

Hooks filed suit in admiralty in the Eastern District of Louisiana against a number of parties. With respect to Eckstein, Hooks alleged that the PAT MCDANIEL was in violation of a number of INRs and thus at fault. Eckstein counterclaimed alleging both statutory and INR violations by Hooks, and further brought third-party claims against Vizier pursuant to Federal Rule of Civil Procedure 14(c), arguing that Vizier was responsible for all of Hooks's claims against Eckstein. After a bench trial, the district court found all three parties partially liable. Only Hooks has appealed.

## II.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *Mid-South Towing Co. v. Exmar Lux*, 418 F.3d 526, 531 (5th Cir. 2005) (quoting *Kona Tech Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000)) (internal quotation marks omitted). Findings of fact are clearly erroneous only when a review of the record leaves a "definite and firm conviction that a mistake has been made." *Stolt Achievement v. Dredge B.E. Lindholm*, 447 F.3d 360, 363 (5th Cir. 2006). "If the district court's account of the evidence is plausible in light of the record, this [c]ourt may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 363-64.

## III.

## A.

We will first turn our attention to Hooks's argument that the district court erred in applying *The Pennsylvania* presumption against the MIKE HOOKS. The rule of *The Pennsylvania* has its origin in a seminal admiralty case, in which the Supreme Court established the burden-shifting presumption for causation

No. 12-30474

when a vessel "at the time of a collision is in actual violation of a statutory rule intended to prevent collisions." 86 U.S. (19 Wall.) 125, 136 (1873). "In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, *but that it could not have been.*" *Id.* (emphasis added); *see also Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001). "The rule thus creates a presumption that one who violates a regulation intended to prevent collisions will be deemed responsible." *Tokio Marine*, 235 F.3d at 966. The presumption, however, is rebuttable and "applies only to violations of statutes that delineate a clear legal duty." *Id.*

### B.

We agree with the district court that INR 9(g) establishes such a clear legal duty. The regulation expressly prohibits vessels from anchoring in narrow channels, except in exceptional circumstances. Given the facts of the instant case, which we shall shortly discuss, we hold that the district court did not clearly err in applying *The Pennsylvania* rule against Hooks. Furthermore, because Hooks failed to show "that [the MIKE HOOKS] could not have been" a cause of the allision, Hooks did not rebut the presumption of causation. *The Pennsylvania*, 86 U.S. (19 Wall.) at 136. Accordingly, based on these findings, the district court thus did not err in holding Hooks partially liable as a result.

Originally enacted by Congress,[7] the INRs established the "rules of the road" for proper navigation based on long-standing principles and were intended to prevent collisions in inland waterways. Indeed, the INRs "apply to all vessels upon the inland waters of the United States." 33 C.F.R. § 83.01(a) (INR 1). INR 9 sets forth the rules for vessels operating in narrow channels. 33 C.F.R. §

---

[7] The Inland Navigational Rules Act of 1980, Pub. L. No. 96-591, which codified the INRs at 33 U.S.C. §§ 2001-2038, was repealed in 2010. The current rules subsequently were promulgated as Part 83 of Title 33 of the Code of Federal Regulations.

No. 12-30474

83.09. Subsection (g) states, "Avoidance of anchoring in narrow channels. Every vessel shall, if the circumstances of the case admit, avoid anchoring in a narrow channel." *Id.*; *see also* 33 C.F.R. 83.02(b) (Rule 2) ("In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger."). As part of the INR's overall scheme to manage the risk of collisions, INR 9(g) plainly imparts a clear legal duty on vessels to avoid mooring in narrow channels absent special circumstances. Violation of such a regulation is sufficient to trigger the rule of *The Pennsylvania*.

Although the INRs do not define "narrow channel," we have held that the term generally includes bodies of water that are less than 1,000 feet in width. *See Marine Transp. Lines v. M/V TAKO INVADER*, 37 F.3d 1138, 1142-43 (5th Cir. 1994) (noting that "the determination of what is a 'narrow channel' is a mixed question of law and fact"). Here, the Wax Lake intersection admittedly was less than 1,000 feet wide, and the district court made specific factual findings regarding the dangers associated with the intersection, including the existence of high water conditions, strong currents and eddies, and high winds. The district court thus did not clearly err in finding that the area where the MIKE HOOKS moored was a narrow channel. Hooks, however, raises two arguments as to why the district court erred in finding that the MIKE HOOKS was in violation of INR 9(g).

(1)

Initially, Hooks asserts that INR 9(g) is inapplicable unless the vessel first is found to be an obstruction of navigation. Hooks bases its argument primarily on *Self Towing, Inc. v. Brown Marine Services*, 837 F.2d 1501 (11th Cir. 1988),

No. 12-30474

in which the Eleventh Circuit evaluated the statutory predecessor to INR 9(g)[8] and held that, "The touchstone for a violation under [INR 9(g) and other statutory provisions] is that the offending vessel obstructed the passage of another vessel." *Id.* at 1504. The court's interpretation, however, was in large part premised on a Senate Report, which stated that "Rule 9(g) . . . is essentially an embodiment of existing law," before quoting the text of Rivers and Harbors Act § 409. S. Rep. No. 96-979 ("Section 409 of the title 33, U.S.C. states: it shall not be lawful to tie up or anchor barges or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft."); *see also Self Towing*, 837 F.2d at 1504 n.6. We find *Self Towing* unpersuasive and decline to adopt its interpretation of INR 9(g).

In determining that INR 9(g) required an antecedent finding that a vessel was an obstruction of navigation in order for the rule to be violated, *Self Towing* departed from the plain wording of the statute. As noted above, INR 9(g) states only that: "Every vessel shall, if the circumstances of the case admit, avoid anchoring in a narrow channel." 33 C.F.R. § 83.09(g). "[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *E.g., BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004); *In re Amy Unknown*, 701 F.3d 749, 760 (5th Cir. 2012) (en banc) ("Where 'the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)) (internal quotation marks omitted)).

INR 9(g) is unambiguous. The rule ("shall . . . avoid") expressly prohibits vessels from anchoring in narrow channels, subject only to the exception where circumstances do not permit alternative action. And, whether circumstances excuse an otherwise clear violation of INR 9(g) obviously turns on the facts and

---

[8] The text of the statute and the current regulation are identical.

No. 12-30474

must be resolved on a case-by-case basis. Although INR 9(g) violations may likely occur when one of the vessels arguably was an obstruction to navigation, INR 9(g) certainly does not mandate the district court to first adjudge the moored vessel to be an obstruction. Indeed, nothing in INR 9 suggests an obstruction requirement. The MIKE HOOKS therefore violated INR 9(g) unless the prior incident with the SARAH D qualified as a circumstance excepting the dredge from the general rule.

(2)

We thus turn to Hooks's second argument that the district court clearly erred in finding that the MIKE HOOKS could have been moved to an alternative mooring location. In short, Hooks argues that the starboard-side hole in the dredge was a sufficient factual condition to allow it to anchor in the narrow Wax Lake intersection. Hooks's argument essentially is based on our decision in *Crescent Towing & Salvage Co. v. CHIOS BEAUTY MV*, 610 F.3d 263 (5th Cir. 2010), in which we noted that the decisions of imperiled parties are entitled to deference. *See id.* at 267-68. We stated that, "It has long been the law that errors in judgment committed by a vessel put in sudden peril through no fault of her own are to be leniently judged. . . . Courts are not supposed to second guess parties in peril and expect from them the most precise judgments." *Id.* at 267 (alteration in original) (citation omitted). *Crescent Towing*, however, involved a challenge to the appropriate negligence standard of care, with the vessel arguing that the district court should have applied the *in extremis* standard. *Id.* at 268. No such argument is raised in the instant case.[9] And, although we recognize the general proposition that imperiled parties should not be second-guessed by courts, the district court carefully reviewed the evidence

---

[9] Indeed, Hooks's decision to proceed to the Wax Lake intersection with a picket boat that it knew would not physically assist passing traffic may deprive the MIKE HOOKS of the deference described in *Crescent Towing*.

No. 12-30474

with respect to the situation the MIKE HOOKS faced following the SARAH D collision.

Substantial testimony was offered regarding the dangerous weather and current conditions in the Wax Lake intersection, and the amount of damage caused to the dredge by the SARAH D collision. Witnesses testified that "[i]t was high water season at the time of the allision," and that "the Wax Lake intersection has strong currents and eddies which are stronger during high water season and in windy conditions." Evidence showed that Hooks was aware of these conditions, which caused "passing vessels [to] actively steer toward the north," directly towards the moored dredge. As to the damage suffered by the MIKE HOOKS, Ricky Domengue, the captain of the MIKE HOOKS, testified that there was a "crack above the water level of the dredge," but "there was no imminent danger of it sinking." Despite Hooks's assertion that the MIKE HOOKS was in serious peril, the evidence supports the district court's conclusion that the dredge was not in an emergency situation that excused its violation of INR 9(g). The district court thus did not commit clear error in finding that the dredge could have been moved to an alternative location without a high risk of additional damage.

(3)

In connection with its argument that the district court clearly erred in its finding relating to the availability of alternative mooring locations, Hooks also contends that the district court erred by relying on the testimony of David Scruton, Eckstein's marine navigation expert. At trial, Hooks objected that Scruton was not qualified to be an expert witness because he had never operated a boat in the ICW, he was not licensed to "operate a vessel under the U.S. Coast Guard Rules of the Road," and he was not licensed to do anything in the United States. The district court overruled the objection.

10

No. 12-30474

Challenges to the admission of an individual as an expert witness under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), are reviewed for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). Scruton testified that he was licensed in the United Kingdom and worked under similar circumstances in Europe, Africa, and the Far East; he had over forty years of maritime experience. Although Scruton did not have practical experience concerning the ICW, Hooks has not demonstrated that the district court abused its discretion in admitting Scruton as an expert witness given his extensive experience with maritime navigation.

Moreover, Scruton's testimony regarding alternative mooring locations was based on a chart of the Wax Lake intersection that had already been admitted into evidence.[10] He identified several mooring basins nearby in which the MIKE HOOKS could have moored and been outside of the narrow channel. Scruton further testified that, based on his experience, it would not have taken long to move the dredge to one of the mooring basins. And, he stated that moving the dredge out of the dangerous Wax Lake intersection was the prudent thing to do in the situation.

After careful consideration of all relevant testimony, the district court concluded that, although the MIKE HOOKS was damaged in the SARAH D incident, the damage was not so extensive that it excused the MIKE HOOKS's decision to moor in a narrow channel in violation of INR 9(g). We cannot say that the district court clearly erred in reaching its conclusion. The MIKE HOOKS violated INR 9(g); *The Pennsylvania* rule thus applied; and Hooks failed to show that the dredge could not have been a cause of the allision. The district court therefore properly found Hooks partially liable.

---

[10] At trial, Hooks did not object to the specific testimony regarding other potential mooring locations.

No. 12-30474

## IV.

Having concluded that the district court did not err in finding Hooks liable, we turn now to the district court's apportionment of liability among Hooks, Eckstein, and Vizier. We review the district court's apportionment of fault for clear error. *Tokio Marine*, 235 F.3d at 970.

Hooks argues that, "It is a misapplication of the law to give Eckstein a 50% credit for Vizier's fault when the comparative fault findings in the [district court opinion] as to Eckstein and Vizier are clear and concise." The district court order initially stated that Hooks was 70 percent liable and Eckstein 30 percent liable. The district court further found, however, that Vizier "is 50 percent liable for Hooks's claims against Eckstein. Accordingly, Eckstein is liable for a total of 15 percent of the damages and Vizier is liable for a total of 15 percent of the damages."

Hooks's arguments under Federal Rule of Civil Procedure 14(c) are meritless. Rule 14(c)(1) expressly provides that the third-party defendant, Vizier, may be liable to either the plaintiff, Hooks, or the third-party plaintiff, Eckstein. Here, the district court held Vizier liable for 50 percent of the claims against Eckstein. Hooks has not demonstrated, nor cited any caselaw showing, why such an apportionment of fault is not supported under Rule 14(c), and such an apportionment is not otherwise clearly erroneous. We thus affirm the district court's order finding Hooks 70 percent at fault.

## V.

For the reasons stated above, the district court's judgment of liability with respect to Hooks is, in all respects,

AFFIRMED.