# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 14, 2022

Lyle W. Cayce
Clerk

No. 21-30324

Elizabeth Fry Franklin; Cynthia Fry Peironnet,

*Plaintiffs—Appellants*,

*versus*

Regions Bank,

*Defendant—Appellee*,

_____

Eleanor Baugnies de Paul de St. Marceaux,

*Plaintiff—Appellant*,

*versus*

Regions Bank,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC Nos. 5:16-CV-1152, 5:17-CV-1047

Before Wiener, Graves, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

No. 21-30324

Two sisters and a family friend own a large farm in north Louisiana. The farm sits atop the storied Haynesville Shale, one of the largest natural gas fields in the lower forty-eight states. In 2007, a bank's landman who was managing the sisters' interests extended a mineral lease for only a tenth of the farm. Or so he thought. The landman had misread the extension, which covered the whole farm. The timing could not have been worse. Within months, advances in drilling technology would open up the Haynesville Shale. Lease bonuses soared. But the faulty extension clouded the sisters' farm, possibly cutting them out of the bonanza.

The sisters sued the bank for breach of contract. The district court found the landman violated the standards of his profession by extending the entire lease. But the court ruled this was a "mistake in judgment" under the bank's contract with the sisters, shielding the bank from liability. It also ruled the mistake was not gross fault, which a Louisiana contract cannot exculpate.

We affirm in part, reverse in part, and remand. The landman did not make a mistake in *judgment*, but a mistake pure and simple. He misread the extension. The contract's exculpatory clause does not cover this kind of error, and so we must reverse the dismissal of the sisters' claims.[1] Because we reject the squirrelly notion that the landman's oversight was a mistake in judgment, we need not address whether it was gross fault.

We remand as to damages. The extension stuck the sisters with a lower royalty rate than they would have gotten otherwise. But the parties' experts disagree over whether the differing rates would make any economic difference. The district court did not resolve this technical, fact-bound

---

[1] The district court separately ruled that the family friend did not have a contract with the bank to manage her mineral interests. We do not disturb that ruling.

No. 21-30324

question. It is not our role to do so in the first instance. So, we remand for further proceedings consistent with this opinion.

## I.

## A.

Plaintiffs-Appellants Elizabeth Fry Franklin, Cynthia Fry Peironnet, and Eleanor Baugnies de Paul de St. Marceaux[2] own undivided interests in a 1,805.34-acre farm in Caddo Parish, Louisiana. Franklin and Peironnet, who are sisters, each inherited a 2/6 share in the property from their mother. Baugnies inherited a 1/6 share from Franklin and Peironnet's late sister, Penelope.[3] Under the farm lie deposits of natural gas. The shallower source is a sandstone area known as the "Cotton Valley." The deeper source, starting some ten thousand feet below the surface, is a rock formation known as the "Haynesville Shale," containing vast quantities of natural gas.

In July 2001, Franklin and Peironnet executed "managing agency agreements" with Regions Bank. In September 2001, Baugnies executed a similar agency agreement with Regions. Each agreement was signed for Regions by Carol Rushton.[4] They encompassed management of the landowners' surface interests but not their mineral interests. In December 2001, Peironnet signed an additional agreement with Regions to handle her mineral interests. Franklin agreed to have Regions manage her mineral

---

[2] We refer to the plaintiffs individually as "Franklin," "Peironnet," and "Baugnies," and collectively as the "landowners."

[3] Another 1/6 share is owned by Pamela Comegys, who is not a party to this case.

[4] Rushton was the landowners' point of contact at Hibernia National Bank, which had managed their assets since the mid-1990s. When Rushton left Hibernia for Regions in 2001, the landowners moved their accounts to Regions.

interests in June 2004. Rushton asked Baugnies to sign a similar mineral agreement, but Baugnies declined.

The mineral agreements authorize Regions to develop Franklin and Peironnet's "oil, gas, and other mineral interests." Both agreements contain this exculpatory clause:

> The Bank shall never be individually liable or responsible to Owner for any loss, damage or injury sustained by reason or account of any mistake in judgment of the Bank occurring in connection with the exercise of these powers of attorney or that may be granted by any other power of attorney or delegation of authority to act; and Owner, to induce Bank to accept this appointment, hereby releases and forever discharges the Bank from any and all liability and responsibility for any and all such loss, damage or injury.

The agreements were executed for Regions by a professional landman, Joseph Hand, who then began managing the sisters' mineral interests. As to Baugnies, Hand testified that he managed only her surface interests.

## B.

In June 2004, Hand negotiated on Franklin and Peironnet's behalf a mineral lease with Prestige Exploration. The lease covered the entire 1,805.34 acres and had a three-year term starting June 22, 2004. Prestige paid a lease bonus of $100 per acre and agreed to pay a 20% royalty on the gross proceeds.

The lease included two standard "use-it-or-lose-it" clauses. The first provided that, at the end of the term, the lease would automatically extend as to any acreage that had been drilled and was still producing gas in paying

No. 21-30324

quantities.[5] The second clause terminated the lease as to "deep rights"—*i.e.*, mineral rights more than 100 feet below the deepest depth drilled—even if there was a shallower well producing paying quantities.

Hand signed the lease for Franklin and Peironnet. Baugnies signed for herself. Hand testified that, although he represented only Franklin and Peironnet, he sent the lease to Baugnies "as a courtesy" and told her she would be "welcome to do the same thing, but you're under no obligation to do so." Shortly after that, Prestige assigned the lease to Matador Resources.

## C.

In 2007, as the lease neared expiration, Matador had drilled on all but 168.95 acres (*i.e.*, less than a tenth of the entirety). Drilling had entered only the Cotton Valley and not the Haynesville Shale below it. Accordingly, the lease was set to expire as to the nonproducing 168.95 acres and also as to the "deep rights" below the remaining acreage.

In May 2007, Matador's Russell Mouton contacted Regions and the landowners to negotiate an extension of the lease. At this point, John Moore, another professional landman at Regions, had taken over management of Franklin and Peironnet's mineral interests from Hand. Matador sought a 12-month extension for $33 per acre. Moore countered at $100 per acre. They ultimately settled at $75 per acre for an 18-month extension.

Moore testified that he did not represent Baugnies in these negotiations. When first contacted by Mouton, Moore maintained he represented only Franklin and Peironnet and did not even know Baugnies. Mouton reached out to Baugnies directly, and she, in turn, contacted Moore

---

[5] Conversely, the lease would expire as to any undeveloped acreage. This is known as a "horizontal Pugh clause."

(she stated she did not realize Moore "was on [her] account"). Baugnies was not happy after talking with Moore, claiming he "was very rude and not [] willing to provide services" as Hand had always done. After that, Baugnies did not speak "very much" with Moore about the lease extension. Instead, she communicated with Mouton directly.

Moore executed the lease extension on Franklin and Peironnet's behalf on August 22, 2007. Baugnies signed the extension for herself. She claimed that she did so because Hand (the previous landman) advised her to. But Hand testified he did not work on the extension at all. Baugnies admitted that neither Moore nor Rushton advised her to sign the extension.

After the extension was executed, Matador paid each of the landowners a lease bonus payment that reflected the value of 168.95 acres. For example, Franklin and Peironnet each received $4,224, which corresponds to $75 per acre for a one-third share of 168.95 acres. But there was a problem. The lease extension does not say it was limited to 168.95 acres. Entitled "Amendment of Oil and Gas Lease (Extension of Primary Term)," the document amended the 2004 lease only by replacing the original three-year term with a term of four years and six months. As for the acres covered, however, the extension pointed back to the 2004 lease. Indeed, it emphasized that "[e]xcept as amended hereby, said Lease shall remain unchanged." In other words, Moore made a mistake. Moore meant to extend the 2004 lease only as to the 168.95 acres, but, as the district court found, he signed a document whose "legal effect [was] extending the entire 2004 lease for eighteen (18) months, including the deep rights," for which "[n]o consideration was paid by Matador."

## D.

The mistake was poorly timed. Mere months after the faulty extension, in early 2008, new drilling technology emerged that would open

up the Haynesville Shale. Lease values skyrocketed, reaching a peak in July and August 2008 of $25,000 to $30,000 per acre. Prices began receding shortly thereafter, however, and crashed in late 2008 due to a steep drop in natural gas prices. Shortly before those events, in April 2008, Matador and Regions (through Hand) began squabbling over how many acres the 2007 extension covered—Matador thought the entire acreage, Hand thought only the 168.95 acres. Regions advised Franklin and Peironnet to sue Matador to settle the issue. They did so in state court on May 15, 2008, and Baugnies later joined as a plaintiff.

Around this time, Petrohawk Energy contacted Regions about a mineral lease on the farm. On May 4, 2008, Petrohawk offered $8,750 per acre with a 25% royalty, contingent on Petrohawk's ability to lease all depths of the Haynesville Shale. The offer was accepted by a Regions vice president on May 7, 2008. During initial discussions, Regions informed Petrohawk about the dispute over the extension and the Matador lawsuit. After investigating, Petrohawk agreed in July 2008 to lease the deep rights below the 1,636.39 acres in dispute with Matador. Petrohawk also agreed to fund the Matador lawsuit up to $50,000 and "tak[e] [it] over" for the landowners and Regions. The final lease agreement with Petrohawk provided a nonrefundable lease bonus price of $8,750 per acre, a 25% royalty, and a three-year term. The lease was executed on July 16, 2008, and the landowners were paid the bonuses.

That same day, Matador assigned its lease to Chesapeake Louisiana for $20,000 per acre plus a 25% royalty. At this point, Chesapeake and Petrohawk had conflicting interests in the deep rights below 1,636.39 acres of the farm.

No. 21-30324

### E.

The Louisiana Supreme Court decided the Matador suit in 2013. *See Peironnet v. Matador Res. Co.*, 2012-2292 (La. 6/28/13); 144 So. 3d 791. The court ruled that the 2007 extension unambiguously extended the original 2004 lease for all 1,805.34 acres, including the deep rights. It found Moore's mistake both unilateral and inexcusable, calling the error "easily detectable and [one that] could have been rectified by a minimal amount of care, *i.e.*, by simply reading the document and/or by requesting simple changes to the written offer before acceptance." *Id.* at 814 (citations omitted).

So, Matador's lease prevailed, Petrohawk could not drill into the Haynesville Shale, and the landowners received no royalties from Petrohawk. The landowners were stuck with their 2007 lease extension with Matador, which gave them the 20% royalty rate in the 2004 lease.

### F.

The landowners then sued Regions for breach of contract in the Western District of Louisiana. They alleged Moore mishandled the lease extension, which prevented them from obtaining higher bonus and royalty payments from Petrohawk as to the 1,636.39 acres.

After a four-day bench trial, the district court dismissed the landowners' claims and entered judgment for Regions. The court first concluded that Baugnies failed to prove she had a contract with Regions to manage her mineral interests. It next concluded that Regions breached the mineral agreements with Franklin and Peironnet when Moore signed the extension without limiting it to 168.95 acres, excluding the deep rights, or receiving compensation for the full acreage.

The court held, however, that Regions was not liable to Franklin and Peironnet because the exculpatory clause in the agreements excused Moore's

8

"mistake in judgment." It further held that Moore's mistake did not amount to "gross fault" that would nullify the exculpatory clause under Louisiana law. *See* La. Civ. Code Ann. art. 2004. Finally, the court concluded that even if Regions were liable for Moore's mistake, the landowners could not show the faulty lease extension damaged them. The landowners timely appealed.

## II.

We begin with Baugnies. She argues the district court erred in finding she did not have an oral or implied contract with Regions to manage her mineral interests. In Louisiana, "[t]he existence or non-existence of a contract is a finding of fact." *Bruneau v. Crescent City Cleaning Servs. Corp.*, 16-17, p. 6 (La. App. 5 Cir. 12/14/16); 209 So. 3d 286, 291 (citation omitted); *see also, e.g.*, *Townsend v. Urie*, 00-0730, p. 6 (La. App. 1 Cir. 5/11/01); 800 So. 2d 11, 15 (citation omitted), *writ denied*, 01-1678 (La. 9/21/01); 797 So. 2d 674. We review the district court's finding for clear error and will upset it only if we have a "definite and firm conviction that a mistake has been committed." *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020). It is not enough that we might have weighed the evidence differently. *Ibid.*

A contract arises when the parties give consent through offer and acceptance. La. Civ. Code Ann. art. 1927. One may consent orally, in writing, or by indicating consent in some other way. *Ibid.* A contract may also be implied "from facts and circumstances showing a mutual intention to contract." *Dumas & Assocs., Inc. v. Lewis Enters. Inc.*, 29,900, p. 7 (La. App. 2 Cir. 12/22/97); 704 So. 2d 433, 438 (citation omitted). "Consent to an obligation may be implied from action only when circumstances unequivocally indicate an agreement or when the law presumes it." *Okuarume v. S. Univ. of New Orleans*, 17-0897, p. 6 (La. App. 4 Cir. 4/25/18); 245 So. 3d 1260, 1265 (citation omitted). To prove a contract's existence, a

No. 21-30324

party must provide a witness and corroborating evidence. La. Civ. Code Ann. art. 1846; *see Hodson v. Daron Cavaness Builder, Inc.*, 2017-1235, p. 3 (La. App. 1 Cir. 2/27/18); 243 So. 3d 597, 599.

We see no error, clear or otherwise, in the district court's finding that Baugnies did not have an oral or implied agreement with Regions to manage her mineral interests. Unlike Franklin and Peironnet, Baugnies never signed a written agreement for mineral-interests management. In fact, she declined to do so. Her agency contract with Regions pertained to real estate services, "such as rental and leasing of property, sales negotiations, [and] payment of real estate taxes," not mineral interests. *Franklin v. Regions Bank*, No. 5:16-cv-01152, 2021 WL 1907836, at *1 (W.D. La. May 12, 2021). Further, Hand (the first Regions landman) testified that when he negotiated the original mineral lease in 2004, he did not represent Baugnies. Hand only managed Baugnies's surface interests. And Baugnies did not pay Regions for mineral management services.[6] As to the 2007 extension with Matador, Hand testified he was uninvolved and did not advise Baugnies about it. Moore (the second Regions landman) informed Matador that Regions did not represent Baugnies, which was corroborated by Matador's Mouton. Instead, Mouton explained that he dealt directly with Baugnies on the extension, which Baugnies herself confirmed.[7] And when executing the extension, Mouton differentiated the two transactions—one with Regions, on behalf of Franklin and Peironnet, and one with Baugnies.

---

[6] The district court found that, prior to the Petrohawk lease in 2008, Baugnies only paid a standard $150 monthly fee to Regions pursuant to her real estate management agreement.

[7] Baugnies herself testified that she "no longer dealt very much with Mr. Moore" after her first call with him.

No. 21-30324

Given such evidence, the district court found that "Baugnies has not proven she had an oral or implied-in-fact contract with Regions prior to 2008 and certainly not at the time the lease extension at issue was negotiated and signed." That finding is not "implausible in light of the record considered as a whole." *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 233 (5th Cir. 2022) (citation omitted). We will not disturb it.

## III.

We turn to Franklin and Peironnet. They fault the district court's ruling that the exculpatory clause in the mineral agreements shielded Regions from Moore's mishandling of the 2007 extension. Specifically, they contend Moore's error was not a "mistake in judgment" under the clause and, even if it were, the error was gross fault that would nullify the clause. We conclude that Moore's error was not a mistake in judgment, so we need not reach whether he committed gross fault.

While finding that Moore "violated the standard of care of a landman," the district court nonetheless concluded Moore committed a "mistake in judgment" under the exculpatory clause. We review *de novo* the district court's interpretation of the clause as well as its application of the clause to undisputed facts. *See Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 597 (5th Cir. 2017); *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

Drawing on a standard legal dictionary, the district court defined "mistake" as an "error, misconception, or misunderstanding," and "judgment" as "the mental faculty that causes one to do or say certain things at certain times, such as exercising one's own discretion or advising others." *See Mistake*, BLACK'S LAW DICTIONARY (10th ed. 2009); *Judgment*, BLACK'S LAW DICTIONARY (10th ed. 2009). Turning to the facts, the court pointed out that Moore "engaged in negotiations" with Matador,

11

"read the lease extension," but "simply failed to comprehend that the lease extension extended the entire lease, including the deep rights." Based on this reasoning, the court concluded that "what Moore did was a 'mistake in judgment.'" We disagree.

No one doubts that Moore made a "mistake." He thought the extension covered only 168.95 acres when it actually covered all 1,805.34 acres. The question here, though, is whether that mistake was one of "judgment"—*i.e.*, of "exercising . . . discretion." *Judgment*, BLACK'S LAW DICTIONARY (10th ed. 2009). It was not. One makes a mistake in judgment by "fail[ing] to adopt the best or wisest course," *Smith v. Marquette Cas. Co.*, 247 La. 1054, 1065 (1965); 176 So. 2d 133, 137 (collecting sources), improperly "weigh[ing] competing interests," *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983) (citation omitted), or fumbling "a hard choice between competing courses," *Crescent Towing & Salvage Co. v. CHIOS BEAUTY MV*, 610 F.3d 263, 267–68 (5th Cir. 2010) (citation omitted). Moore's mistake was not like that. He did not, for example, unwisely accept a low price per acre or royalty rate when he could have gotten a better deal for the sisters. That would have been a mistake in *judgment*.

What Moore did was a mistake, full stop. He misread the lease extension. As the Louisiana Supreme Court explained, this error "was easily detectable and could have been rectified by a minimal amount of care, *i.e.*, by simply reading the document and/or by requesting simple changes to the written offer before acceptance." *Peironnet*, 144 So. 3d at 814 (citations omitted); *see also Tweedel v. Brasseaux*, 433 So. 2d 133, 137 (La. 1983) ("[I]f a party can read, it behooves him to examine an instrument before signing it . . . ."). To find that this error fell within the exculpatory clause would misread the clause to forgive any mistake, not just mistakes in judgment. *See, e.g.*, *Parkcrest Builders, LLC v. Liberty Mut. Ins. Co.*, 26 F.4th 691, 695 (5th Cir. 2022) ("Louisiana law disfavors interpretations that render words or

phrases superfluous, and a court should read each term in light of the contract as a whole." (citing *Lobell v. Rosenberg*, 15-0247, p. 9 (La. 10/14/15); 186 So. 3d 83, 89)); LA. CIV. CODE ANN. art. 2049.

Accordingly, the district court erred in finding Moore's conduct was a "mistake in judgment" covered by the exculpatory clause.

IV.

Given our conclusion that the exculpatory clause cannot shield Regions from liability, we must address the district court's alternative ruling that the sisters failed to show they were damaged by Moore's mistake. Calculation of damages is a finding of fact we review for clear error. *Luwisch*, 956 F.3d at 326 (citation omitted).

Franklin and Peironnet advance two theories of how they were damaged by the mishandling of the lease extension. First, they argue that otherwise they would have received a higher lease bonus than the $8,750 per acre they received from Petrohawk in July 2018. Second, they argue that they would have received a higher royalty rate from the Petrohawk lease (25%) than from the Matador lease (20%).

The district court addressed only the first damages theory, and we see no clear error in that ruling. Franklin and Peironnet point out that Petrohawk's initial May 2018 offer of $8,750 per acre was not finalized until July 2018 due to the cloud on the title created by the lease extension. Because bonuses were higher in July 2018, they argue they should receive the difference between the July rate and the $8,750 per acre they received. The district court did not clearly err in rejecting this argument. As the court explained, had there been no lease extension, Regions' acceptance of the Petrohawk offer in May 2018 "would have been binding and would have resulted in Plaintiffs receiving exactly what they received, which was $8,750.00 per acre in lease bonus payments[.]" Hand testified that he would

have accepted Petrohawk's $8,750 offer immediately had the deep rights been available. And Petrohawk made offers on several other Regions properties, with each around $8,750 per acre. This evidence thus supports the district court's finding that Regions would have accepted the $8,750 per acre bonus and finalized the agreement in May 2018 had the extension excluded the deep rights. Accordingly, the court did not clearly err.

We must remand for further proceedings, however, because the district court did not squarely address Franklin and Peironnet's second damages theory—namely, that Moore's error stuck them with the 20% royalty rate from the original lease, depriving them of the 25% rate from the Petrohawk lease. *See supra* Sections I.B, I.E. Because the evidence supports the finding that Regions would have immediately accepted Petrohawk's May 2018 offer absent the cloud on the deep rights, it follows that, but for the mistaken lease extension, the landowners would have received a 25% and not a 20% royalty rate.[8]

The matter is not as simple as mathematically calculating the difference between a 20% and a 25% rate. Each side presented conflicting expert testimony on how the respective rates would apply.[9] The district court did not address this issue or make any credibility or fact findings regarding the dueling experts. That is not our job, and so we leave the matter to the

---

[8] The district court suggested that the royalty rates in the original 2004 lease and the Petrohawk lease were the same. The record plainly reflects, however, that the original lease had a 20% rate and the Petrohawk lease had a 25% rate.

[9] The district court noted this disagreement but did not resolve it. The Petrohawk lease's 25% royalty rate was "at the well," equivalent to net proceeds. By contrast, the Matador lease's 20% royalty rate was on gross proceeds. Regions' experts opined that the 20% gross proceeds rate gave the sisters nearly $1,000,000 more than the Petrohawk "at the well" rate. On the other hand, the sisters' expert opined that the 20% royalty rate caused them to lose over $6,000,000 in royalties by comparison to the Petrohawk lease.

district court on remand. *See Strauch v. Gates Rubber Co.*, 879 F.2d 1282, 1285 (5th Cir. 1989) ("An appellate Court is in no position to weigh conflicting evidence and inferences or to determine the credibility of witnesses; that function is within the province of the finder of fact." (citation omitted)).

## V.

Accordingly, the district court's judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.